## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JEANINE A. MOTLEY,
Plaintiff

vs

Case No. 1:08-cv-418
(Spiegel, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
Defendant

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 8), and the Commissioner's response in

opposition. (Doc. 9).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1971, and was 36 years old at the time of the ALJ's decision.

Plaintiff attended school to the twelfth grade and has past work experience as a nurses assistant

and housekeeper. Plaintiff filed applications for DIB and SSI in April 2006, alleging an onset of

disability of August 2, 2004, due to heart problems, hypertension, knee problems, asthma and

sleep apnea. (Tr. 102-105, 123). Plaintiff's applications were denied initially and upon

reconsideration. Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Larry Temin during which a Vocational Expert (VE) appeared and testified.

On December 20, 2007, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from a severe combination of impairments of obesity, status post gastric bypass on January 3, 2006, peripheral neuropathy of the lower extremities, adjustment disorder, and pain disorder. (Tr. 19). The ALJ discussed plaintiff's associated impairments of hypertension, sleep apnea, asthma/allergic rhinitis, fatty liver, chest pain, and degenerative joint disease, but determined that plaintiff has no significant functional limitations arising from these impairments. (Tr. 20). The ALJ found that plaintiff's impairments, alone or in combination, do not meet or equal the Listing of Impairments. (Tr. 20). According to the ALJ, plaintiff retains the following residual functional capacity (RFC): she can lift/carry/push/pull up to 10 pounds occasionally and 5 pounds frequently; she can stand and/or walk in combination for up to 2 hours per 8-hour workday (she can stand for 15 minutes at a time, then must be able to sit for 5 minutes; she can walk for 15 minutes at a time, then must be able to sit for 2-3 minutes); she can sit for up to 7 hours per 8-hour workday (she can sit for up to 45 minutes at one time, with the option to then stand for 2 to 3 minutes); she can only occasionally stoop, kneel, crouch, and climb ramps/stairs; she should not crawl, climb ladders/ ropes/scaffolds, or work at unprotected heights; she can perform only simple, routine, repetitive tasks, remember and carry out only short and simple instructions, and make only simple work-related decisions; and her job should not require more than ordinary and routine changes in work settings or duties. (Tr. 21). The ALJ determined that plaintiff's allegations regarding her

2

limitations are not totally credible. (Tr. 25). The ALJ determined that plaintiff is unable to perform her past relevant work. Based on the vocational expert's testimony, the ALJ determined that plaintiff could perform a range of sedentary jobs that exist in significant numbers in the national economy. (Tr. 28-29). Consequently, the ALJ concluded that plaintiff is not disabled under the Act, and therefore not entitled to disability benefits. The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's review is limited to determining whether "'the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Warner v. Commissioner of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997)). *See also Longworth v. Commissioner Social Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Under the substantial evidence standard, the Commissioner's findings must be upheld if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). If supported by substantial evidence, the Commissioner's decision is entitled to

3

deference "even if there is substantial evidence in the record that would have supported an opposite conclusion."*Warner,* 375 F.3d at 390 (internal quotation omitted).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations which is the same for purposes of both DIB and SSI benefits. *See* 20 C.F.R. §§ 404.1520, 416.920; *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). First, the Commissioner determines whether the individual is currently engaging in

4

substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

5

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and

6

background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a

7

long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v.*

*Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by the evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). A hypothetical question is adequate if it accurately portrays a claimant's abilities and limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, a statement of claimant's abilities and limitations need not include an enumeration of every diagnosis or impairment. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), as clarified in *Webb v. Commissioner*, 368 F.3d 629, 631-32 (6th Cir. 2004). *See also Foster v. Halter*, 279 F.3d 348, 356 (6th Cir. 2001). In addition, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994). *See also Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1235 (6th Cir. 1993)(ALJ required to incorporate only those limitations accepted as credible in hypothetical to VE).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits

9

granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.,* 892 F.2d 1043, 1990 WL 94 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher,* 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher,* 17 F.3d at 176. *See also Felisky v. Bowen,* 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

Plaintiff weighed over 400 pounds in 2004 and 2005. (Tr. 181-183, 205, 221-228). On

10

May 10, 2005, she underwent a psychological evaluation by Dr. Glynn, Psy.D., who opined that plaintiff appeared to be a good candidate for gastric bypass surgery. (Tr. 204-208). Dr. Glynn opined that plaintiff's mental symptoms were minor with only some symptoms of anxiety that appeared to be a consequence of her weight. (Tr. 208). Dr. Glynn reported that plaintiff's education and work history demonstrated a pattern of completing activities that took sustained persistence and effort. (Tr. 208). He assigned a Global Assessment of Functioning (GAF)[1] rating of 65 (consistent with only mild symptoms). (Tr. 208).

Dr. J. Wesley Alexander, M.D., performed gastric bypass surgery on January 3, 2006. Dr. Alexander reported that plaintiff weighed 400 pounds and had hypertension, asthma, sleep apnea, and degenerative joint disease. (Tr. 191). Dr. Alexander noted that during her post-operative stay, plaintiff complained of numbness and paraesthesias in her legs. (Tr. 263). Plaintiff was discharged on January 7, 2006. (Tr. 191).

In February 2006, plaintiff experienced leg weakness while standing and fell. (Tr. 211). A March 30, 2006 MRI of plaintiff's right mid and distal femur revealed no evidence of a fracture, or of a muscular strain or tear. (Tr. 195). There was a finding of moderate size knee joint effusion as well as a nonspecific finding of an underlying anemia. (Tr. 195). X-ray views of plaintiff's right knee showed no sign of joint effusion, but some mild soft tissue swelling and mild calcification of her medial collateral ligament. (Tr. 198). X-rays of the lumbar spine

---

[1]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34.

showed mild narrowing at L4-L5 and L5-S1, with no evidence of a bony destructive process or fracture. (Tr. 199).

On April 3, 2006, plaintiff was examined by Dr. Boughaba for a neurological consultation after plaintiff complained of progressive weakness in her legs following the gastric bypass surgery. (Tr. 211-14). Dr. Boughaba assessed leg weakness "associated with mild sensory symptoms" and noted that plaintiff's clinical features suggested "a sensory peripheral neuropathy predominantly affecting the lower extremities and involving both distal and proximal muscles." (Tr. 213). Dr. Boughaba suspected the etiology of the neuropathy to be a vitamin deficiency in view of plaintiff's recent bariatric surgery. *Id.* Dr. Boughaba recommended an EMG examination of both of legs and suggested that plaintiff might benefit from intensive physical rehabilitation. (Tr. 213).

On July 6, 2006, state agency medical consultant, Jon Starr reviewed the record (Tr. 254-61) and opined that plaintiff could perform light work. (Tr. 255).

Dr. Alexander reported that when plaintiff was last seen on July 14, 2006, she had lost 103 pounds and was still complaining of continued muscle weakness and paraesthesias of the upper legs. (Tr. 263). Dr. Alexander felt that it might be related to neuropathy and made a referral to an orthopedist. (Tr. 263).

Plaintiff was examined by clinical psychologist Susan Kenford, Ph.D., on August 31, 2006. (Tr. 300-05). Dr. Kenford assessed an adjustment disorder with mixed anxious and depressed mood and "rule out" pain disorder associated with both psychological factors and a general medical condition. (Tr. 304). Dr. Kenford assessed a GAF rating of 35 (indicative of serious symptoms) and noted that since her decline in physical functioning, plaintiff "has begun

12

to feel more vulnerable when out in the world." (Tr. 304). Plaintiff reported that an anti-depressant medication had made her depression less severe and more manageable. (Tr. 304). Although an anti-anxiety medication helped to some degree, plaintiff still felt very frightened when out of her house. (Tr. 304). Dr. Kenford also opined that if plaintiff were more confident about her physical capacity, her ability to get along with others would return to normal levels. (Tr. 305). Dr. Kenford also opined that plaintiff's ability to perform simple, repetitive tasks was intact. (Tr. 305).

On September 18, 2006, Dr. Boughaba saw plaintiff in the neurology clinic for a return visit for bilateral lower extremity weakness. Plaintiff reported having good and bad days, being able to walk a little better using a cane from her bedroom to the bathroom on good days, which occurred three days per week, and using a wheelchair on the bad days. (Tr. 333). Dr. Boughaba reported a "grossly intact" mental status. (Tr. 334). Motor strength, foot flexion, and sensory exam were normal and deep tendon reflexes were symmetrical. Dr. Boughaba impression was that plaintiff's bilateral leg weakness:

appears to be more in the femoral nerve distribution, suggesting bilateral femoral neuropathy. The other possible localization is upper lumbar roots, that is, L2, L3 and L4. The patient has mild findings on exam suggestive of peripheral neuropathy as well, like her absent ankle jerks and her complaints of mild numbness in both feet. Otherwise, there is not much evidence of severe clinical peripheral neuropathy.

(Tr. 334). Dr. Boughaba recommended an EMG of both legs to try to localize the problem.

An MRI of the lumbar spine showed a moderate sized right foraminal disc protrusion at L4-L5 causing mild right foraminal narrowing, but no central canal stenosis. (Tr. 340). There was mild disc protrusion at L5-S1. (Tr. 341). The impression was degenerative disc disease with

13

"no abnormal enhancement with normal appearing cauda equina and no central stenosis." (Tr. 341).

On September 29, 2006, state agency reviewing psychologist Roseann Umana, Ph.D., reviewed the record and opined that plaintiff was not significantly limited in thirteen of nineteen areas of mental activities related to the ability to work. (Tr. 320-21). Dr. Umana did not rate one area and she rated the other six areas as moderately limited. (Tr. 320-21). Dr. Umana did not rate any mental areas as having "marked" limitations.

On January 8, 2007, Dr. Boughaba saw plaintiff for a general neurology visit. (Tr. 327-30). Dr. Boughaba reported that plaintiff's symptoms were suggestive of arthritis that affected her hips and radiated down her thighs. (Tr. 329). Dr. Boughaba did not see "much evidence of peripheral neuropathy on the neurologic examination to the exception of absent knee and ankle jerks; she has neuropathic symptoms of tingling in her feet as well." (Tr. 329). Dr. Boughaba reported that she "could not detect muscle weakness" and "thought her pain could be related to arthritis and less likely to diabetic amyotrophy or femoral neuropathy." (Tr. 329). She scheduled an EMG, and on January 12, 2007, the EMG produced nerve conduction studies of plaintiff's lower extremities that were normal: "Specifically, there was no EMG evidence of peripheral neuropathy or femoral mononeuropathy." (Tr. 331).

On January 12, 2007, Heather N. Phillips, M.D., completed a Physical Residual Functional Capacity Questionnaire. (Tr. 350-54). Dr. Phillips opined that plaintiff could occasionally lift up to twenty pounds (Tr. 353), sit for at least six hours in an eight-hour workday (Tr. 352), walk for one city block, and stand for 5 to 10 minutes at one time for a total of less than two hours in an eight-hour workday. Dr. Phillips also reported that

14

plaintiff's physical and emotional impairments were not reasonably consistent with the symptoms and functional limitations described in her evaluation. (Tr. 351). Dr. Phillips explained that plaintiff "[d]efinitely has weakness on exam of lower extremity strength, but symptoms out of proportion to measured findings on exam (strength 4/5 but pt. unable to walk and collapsing from leg weakness." (Tr. 351). Dr. Phillips reported that plaintiff was capable of a "moderate" amount of work stress and has a "[h]igh level of anxiety (at times), worsened when leaving home (fear of collapsing in public)–uses Ativan as needed. Anxiety is [illegible]." (Tr. 352). Dr. Phillips also opined that plaintiff "at times" needed a cane or other assistive device to walk/stand and, on average, would be absent from work about four days per month. (Tr. 353, 354).

## OPINION

Plaintiff raises five assignments of error. First, plaintiff alleges the ALJ erred in assessing plaintiff's mental residual functional capacity. Second, plaintiff argues the ALJ erred by rejecting Dr. Phillips' finding that plaintiff would likely miss four days of work per month. Third, plaintiff contends the ALJ erred by failing to assess whether plaintiff meets or equals Listing 1.02(A). Fourth, plaintiff argues the ALJ erred by not finding plaintiff wholly credible. Fifth, plaintiff contends that ALJ erred when he relied on answers to improper hypothetical questions to the vocational expert in assessing plaintiff's disability claim.

## I. The ALJ's Listing Decision is Without Substantial Support in the Record and Should be Reversed.

Plaintiff argues the ALJ failed to specifically address whether plaintiff meets or equals Listing 1.02A. Listing 1.02A requires:

15

> *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

Thus, to meet Listing 1.02A, an individual must demonstrate (1) a gross anatomical joint

deformity, (2) chronic joint pain and stiffness or other limitation in motion, (3) medical imaging

documenting the abnormality, and (4) an "inability to ambulate effectively." 20 C.F.R. pt. 404P,

§ 1.02A. The fourth requirement of 1.02A, an inability to ambulate effectively, is defined as an

extreme limitation of the ability to walk that interferes very seriously with an individual's ability

to initiate, sustain, or complete activities. *Id.* § 1.00B2b(1). The definition goes on to explain

that "ineffective ambulation" requires a limitation so serious that it does not permit ambulation

without the use of a hand-held assistance device limiting the use of both upper extremities. *Id.*

Examples include a walker, two crutches, two canes, or an inability to walk a block at a

reasonable pace on rough or uneven surfaces. *Id.* § 1.00B2b(2). The Listing also cautions that

obesity is an impairment that "is often associated with disturbance of the musculoskeletal system,

and disturbance of this system can be a major cause of disability in individuals with obesity."

Listing 1.00Q. Thus, adjudicators must consider "any additional and cumulative effects of

obesity" when determining whether an individual with obesity meets or equals a Listing. *Id.*

Plaintiff contends that her impairments, in combination, meet or equal Listing 1.02(A).

The ALJ's Listing determination with respect to plaintiff's physical impairments is contained in

one sentence: "Although the claimant alleges an inability to walk effectively, her clinical and diagnostic findings do not reveal an impairment of lifting level severity." (Tr. 20).[2] On appeal to the Appeals Council, plaintiff argued the ALJ erred in his Listing determination. The Appeals Council considered whether plaintiff met Listing 1.00(b)(2) and Listing 1.04(A), but ultimately declined to review the ALJ's decision. (Tr. 3). Plaintiff points out several errors in the Appeals Council's decision. However, because the Appeals Council declined review, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review, and not those of the Appeals Council. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). *See also Sims v. Apfel*, 530 U.S. 103, 107 (2000). Therefore, the Court must consider whether the ALJ's Listing decision is supported by substantial evidence.

As noted above, the ALJ's Listing decision is sparse. Plaintiff contends the record reflects her inability to ambulate effectively as required by the Listing, citing Tr. 42, 301 (used a cane to walk on consultative examination and unsteady gait); Tr. 327 (pain made it hard to walk); Tr. 327, 333 (uses a scooter to get around the store); Tr. 346, 350 (difficulty ambulating); Tr. 334 (limped when walking and had to use a cane to walk); Tr. 351 (riding in wheelchair at some visits/others walking with cane assistance), as well as other findings supporting that she meets or equals the Listing. *See* Tr. 212 (March 2006 hospitalization showing absent ankle and knee reflexes, and decreased sensation); Tr. 328-29, 334 (absent reflexes); Tr. 329 (symptoms suggestive of arthritis affecting hips radiating down thighs anteriorly); Tr. 340-341 (MRI findings showing degenerative disc disease, moderate sized right foraminal disc protrusion at L4-L5, mild

---

[2]The ALJ addresses the Listings for mental impairments in detail, but plaintiff does not challenge the ALJ's decision in this regard.

disc protrusion at L5-S1); Tr. 350 (morbid obesity, lower extremity pain/weakness/parasthesias (possible femoral neuropathy), peripheral neuropathy). On the other hand, the Commissioner points out that Dr. Boughaba's January 2007 report noted gait and station were normal to regular heel, toe and tandem walking, but gait limited by pain in proximal part of legs and hips (Tr. 329) and that while March 2006 records showed decreased sensation, the January 2007 report revealed normal results for vibration and pinprick for both the right and left lower extremity. (Tr. 329). The Commissioner also notes that Dr. Boughaba's records show that the absent ankle and knee reflexes revealed on examination were the only findings suggestive of neuropathic symptoms (Tr. 329) and a subsequent EMG showed no evidence of peripheral neuropathy. The Commissioner argues that given the meager objective findings, the ALJ's minimal articulation of his Listing decision must be upheld, citing *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985).

Unfortunately, the ALJ's decision fails to include any meaningful discussion of the Listings for physical impairments, including the effect of plaintiff's obesity impairment on whether plaintiff meets or equals a Listing. The ALJ's general finding that plaintiff's impairments do not meet or equal a listed impairment does not specifically address the requirements of Listing 1.02A. (Tr. 20). There is nothing in the ALJ's decision to indicate whether he even considered Listing 1.02A. Without discussing the evidence in light of Listing 1.02A's analytical framework, this Court is left with serious doubts as to whether the ALJ's factual assessment adequately considered the criteria of the listing. *See Miller v. Commissioner of Social Sec.*, 181 F. Supp.2d 816 (S.D. Ohio 2001). *See also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)(finding remand warranted when ALJ failed to discuss listing applicable to claimant); *Burnett v. Commissioner*, 220 F.3d 112, 119 (3d Cir. 2000)(same); *Clifton v. Chater*,

79 F.3d 1007, 1009 (10th Cir. 1996)(same). As the Court explained in *Miller*:

> The ALJ . . . failed to discuss the elements of [the Listing] and whether or not the evidence demonstrated that plaintiff satisfied those elements. In the absence of such a discussion, the Court cannot conduct a meaningful review of the record, for it is unclear precisely why, in the ALJ's view, plaintiff did not satisfy [the Listing]. Recognizing that this issue must first be determined by the ALJ, not the Court, *see Clifton* [*v. Chater*]*,* 79 F.3d [1007,] 1010 [(10th Cir. 1996)], a remand is thus required–under the fourth sentence of 42 U.S.C. § 405(g), *see Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991)– in order to afford the ALJ an opportunity to clarify the record.

*Miller*, 181 F. Supp.2d at 820. Without even a minimal articulation of the ALJ's Listing finding, the Court is left without a basis for meaningful judicial review on this issue.

The Court is mindful that in *Price v. Heckler*, 767 F.2d 281 (6th Cir. 1985), the case cited by the Commissioner, the Sixth Circuit upheld the minimal Listing finding set forth by the ALJ in a widow's disability benefit case. In *Price*, the ALJ made a conclusory finding that the plaintiff did not meet or equal a listed impairment. The majority stated, "Although the ALJ's findings of fact could have been stated with more particularity, we are not persuaded that his findings are legally insufficient." *Id.* at 284. The dissent by Judge Peck points out the necessity for clearly articulated findings for purposes of judicial review:

> It is more than merely 'helpful' for the ALJ to articulate reasons (e.g., lack of credibility) for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review. As the Third Circuit put it in *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Zblewski* [*v. Schweiker*]*,* 732 F.2d [75], 79 [(7th Cir. 1984)]. The Sixth Circuit recently cited this language with approval in *Hurst v. Secretary of HHS*, 753 F.2d 517, 519 (1985). If it is 'absolutely essential' to appellate review for an ALJ to state his reasons for crediting particular evidence, it is still more essential that he articulate the reasons for his conclusions. . . .

767 F.2d at 284-85 (Peck, dissenting).

This Court is in agreement with Judge Peck's rationale that *Hurst*, 753 F.2d at 519, which is still good law in this Circuit, requires the ALJ to articulate the evidence accepted or rejected when making a disability finding to enable the reviewing court to engage in meaningful judicial review. *See also Rogers v. Commissioner*, 486 F.3d 234, 248 n.5 (6th Cir. 2007) (requirement of full explanation of findings is premised "in part, upon the need for clarity in later proceedings") (citing *Hurst*); *Bailey v. Commissioner of Social Sec.*, 173 F.3d 428, 1999 W.L. 96920 (6th Cir. 1999); *Morris v. Secretary of Health & Human Services*, 845 F.2d 326, 1988 W.L. 34109 (6th Cir. 1988); *Meade v. Secretary of Health and Human Services*, 893 F.2d 1335, 1990 W.L. 4053 (6th Cir. 1990). Thus, the ALJ must articulate with specificity reasons for the findings and conclusions that he makes. In the absence of any explanation or discussion of the evidence on the issue of whether plaintiff meets or equals Listing 1.02A, the ALJ's conclusion that plaintiff's impairments do not meet or equal a listed impairment is beyond meaningful judicial review. Where, as here, the evidence of record suggests plaintiff may meet or equal Listing 1.02A, the ALJ is required to perform a meaningful analysis to enable the Court perform its reviewing function. In the absence of such an explanation, the ALJ's finding that plaintiff does not meet or equal a listed impairment is not supported by substantial evidence and should be reversed.

## II. Plaintiff's remaining assignments of error are without merit.

The ALJ determined that plaintiff has the mental residual functional capacity to perform "only simple, routine, repetitive tasks; and remember and carry out only short and simple instructions" due to diminished concentration, persistence or pace. (Tr. 27). The ALJ also determined that plaintiff "can make only simple work-related decisions, and her job should not

20

require more than ordinary and routine changes in work setting or duties" due to her anxiety. (Tr.

27). In making this determination, the ALJ gave significant weight to the findings of Dr. Umana,

the state agency reviewing psychologist and little weight to Dr. Kenford's assignment of a GAF

of 35.[3] (Tr. 27).

Plaintiff first assignment of error challenges the ALJ's mental RFC finding as incomplete.

Plaintiff argues the ALJ failed to consider Dr. Umana's additional limitations "that it was harder

for Ms. Motley to be out in the world," that her "ability to complete tasks was functionally

impaired," and that "[g]etting out of her house daily is stressful." (Doc. 8 at 4, citing Tr. 322).

Plaintiff argues that ALJ erred by adopting only parts of Dr. Umana's mental RFC without

explaining his rationale for doing so. (Doc. 8 at 5). Plaintiff also contends the ALJ erred by

rejecting Dr. Kenford's GAF assessment and conclusion that plaintiff had a hard time learning

information, could not apply her cognitive skills, and was significantly impaired in dealing with

stress and pressure on a job. (Doc. 8 at 4, citing Tr. 305). Plaintiff contends that all of these

findings support Dr. Phillips' assessment that plaintiff would miss more than four days of work

per month, a finding the ALJ rejected as unsupported. (Tr. 25).

Plaintiff's first assignment of error is without merit. First, plaintiff fails to suggest what

additional RFC limitations the ALJ should have imposed based on Dr. Umana's findings "that it

---

[3]The DSM-IV categorizes individuals with scores of 31 to 40 as having "Some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work, or school, family relations, judgment, thinking or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *See* DSM-IV at 34. Individuals with scores of 41 to 50 as classified as having "serious" symptoms "(*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *See* DSM-IV at 34. Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." *Id.*

was harder for Ms. Motley to be out in the world," that her "ability to complete tasks was functionally impaired," and that "[g]etting out of her house daily is stressful." (Doc. 8 at 4). Second, and contrary to plaintiff's contention, the ALJ did not ignore Dr. Umana's limitations described above, but reasonably considered Dr. Umana's assessment as a whole. The ALJ acknowledged that plaintiff's "anxiety and stress do make it harder for her to be out in the world" (Tr. 27, 322), but noted that plaintiff's ability to interact with others was "no more than moderately impaired." (Tr. 27). Likewise, the ALJ acknowledged Dr. Umana's opinion that plaintiff's "perception of pain and anxiety would interfere with her ability to complete tasks" (Tr. 27) and accommodated such limitation by limiting plaintiff to "a routine that did not require her to think about abstractions or complex material" and to work involving "only simple, routine, repetitive tasks." (Tr. 27, 305, 322). Dr. Umana assessed plaintiff's mental functioning in nineteen areas, none of which were considered markedly limited and thirteen of which were not significantly limited in any way. (Tr. 320-321). This assessment is consistent with plaintiff's lack of any ongoing mental health treatment (Tr. 34), as well as her testimony that none of her doctors suggested she needs mental health counseling, that she gets along well with others and is a very outgoing person, and that she does not have memory or concentration problems. (Tr. 34, 47, 49).

Plaintiff's mental residual functional capacity assessment was also consistent with the content of Dr. Kenford's examination, albeit not with her GAF assessment of 35. As the ALJ reasonably noted, neither the record nor Dr. Kenford's testing supported the extreme limitations suggested by a GAF rating of 35. The DSM-IV categorizes individuals with scores of 31 to 40 as having "Some impairment in reality testing or communication (*e.g.*, speech is at times illogical,

obscure, or irrelevant) OR major impairment in several areas, such as work, or school, family relations, judgment, thinking or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *See* DSM-IV at 34. Plaintiff has cited to no evidence of impairment in reality testing or communication. Nor was plaintiff assessed as being "markedly" limited in any of the nineteen areas of functions. (Tr. 320-321). While Dr. Kenford did opine that plaintiff was unable to take care of *all* tasks of daily living, those were due to physical and not mental factors. (Tr. 304). Dr. Kenford also opined that if plaintiff became more confident about her physical capabilities, her ability to get along with others, which was only "mildly impaired by her mental health issues" would return to normal. (Tr. 305). Moreover, Dr. Glynn assessed a GAF of 65, some 30 points higher than that of Dr. Kenford's assessment. (Tr. 208). In addition, Dr. Kenford opined that plaintiff was "significantly" impaired in dealing with the everyday stress and pressure of a job (Tr. 305), yet both Dr. Phillips and Dr. Umana determined plaintiff was "moderately" impaired in her ability to withstand the stress of day to day work. (Tr. 322, 352). Given the conflicting opinions of these physicians, the ALJ was free to discredit Kenford's assessment on plaintiff's ability to deal with work stress. *Felisky*, 35 F.3d at 1036. The ALJ reasonably accommodated this limitation as well as plaintiff's learning and cognitive deficits by limiting plaintiff to work involving only simple, work-related decisions and no more than ordinary and routine changes in work settings or duties. (Tr. 27). Since the ALJ's determination in this regard is supported by substantial evidence, his decision must stand regardless of whether this Court would resolve the conflict differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's second assignment of error asserts the ALJ failed to accord proper weight to

23

the opinion of the treating physician, Dr. Phillips, who opined that plaintiff would likely miss on average four days of work per month. (Doc. 8 at 6). Plaintiff argues this assessment is consistent with the plaintiff's report of having "good days" and "bad days" (Tr. 132, reporting 3 "bad days" in a week) and with Dr. Umana's finding that it is "harder for her to be out in the world." (Tr. 322). Plaintiff contends the ALJ erred by not giving the most weight to Dr. Phillips in this regard and by not giving "good reasons" for rejecting this part of Dr. Phillips' RFC assessment.

Initially, the Court notes that the ALJ essentially relied on Dr. Phillips' functional capacity assessment in determining the lifting, standing, walking, and sitting limitations for plaintiff's RFC. (Tr. 24-25). Plaintiff does not take issue with these findings, but disputes the ALJ's rejection of Dr. Phillips' opinion that plaintiff would likely be absent from work about four days per month. (Tr. 25).

As the ALJ reasonably found, Dr. Phillips failed to explain her rationale for her opinion regarding plaintiff's likely absences from work. (Tr. 25). In addition, the ALJ reasonably determined that the evidence of record did not support Dr. Phillips' limitation:

> The claimant reportedly saw Dr. Phillips only once every few months, and the record does not show such intensive treatment that the claimant would have to miss 4 days per month to go to doctor's appointments. The claimant has alleged good and bad days, but she has alleged only difficulty walking and no difficulty sitting. Therefore, it is unclear why the claimant would need to miss 4 days of work per month.

(Tr. 25). Additionally, the ALJ noted that Dr. Phillips reported that plaintiff's symptoms were out of proportion to the measured findings on examination and that 4/5 strength should not cause plaintiff's inability to walk and collapse from alleged weakness. (Tr. 24, 351). The ALJ provided a reasoned explanation for his findings which are supported by substantial evidence.

Plaintiff nevertheless argues that Dr. Kenford's diagnosis of a pain disorder provides a psychological cause of plaintiff's severe leg pain (which was diagnosed by Dr. Boughaba) and accounts for Dr. Phillips' finding that plaintiff's symptoms were out of proportion to the measured findings on examination. (Tr. 351). The problem with this argument is that Dr. Kenford did not diagnose a pain disorder, but rather "rule out" pain disorder. (Tr. 304). More importantly, neither Dr. Phillips nor any other physician of record connects plaintiff's complaints of leg pain with a psychological disorder. Nor does plaintiff explain how Dr. Umana's finding that it is "harder for her to be out in the world" (Tr. 322) from a psychological standpoint translates into missing work four days per month. Without medical evidence to support plaintiff's argument in this regard, and without any citation by plaintiff to other reports from Dr. Phillips supporting this assessment,[4] the Court cannot say that the ALJ's rejection of Dr. Phillips' opinion in this regard was erroneous.

Plaintiff's fourth assignment of error asserts that the ALJ erred by failing "to include the pain disorder as a basis of the disabling pain in addition to the physical causes of the pain." (Doc. 8 at 9). As noted above, Dr. Kenford diagnosed an Adjustment Disorder and "R/O (rule out) Pain Disorder." (Tr. 304). While Dr. Kenford reported that plaintiff met the diagnostic criteria for an Adjustment Disorder and noted the possibility that plaintiff could transition from an Adjustment Disorder to a Generalized Anxiety Disorder, Dr. Kenford did not specifically discuss a Pain Disorder. (Tr. 304). Nor did Dr. Umana discuss or note a pain disorder in her report,

---

[4]To be afforded controlling weight, the opinion of a treating physician must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530; 20 C.F.R. § 404.1527(d)(2). Plaintiff has made no attempt to show how Dr. Phillips' opinion regarding the number of days she would be absent from work is well-supported by medically acceptable clinical and laboratory diagnostic techniques. *Walters*, 127 F.3d at 530.

contrary to plaintiff's assertion in her brief. (Tr. 322). The Court acknowledges that the ALJ included a "pain disorder" as a severe impairment (Tr. 19), a finding that is puzzling given Dr. Kenford's assessment of "rule out pain disorder." Nevertheless, in the absence of any evidence to support the diagnosis and, more importantly, any medical opinion associating a pain disorder with plaintiff's level of pain, the Court cannot say the ALJ erred by not including a pain disorder as a possible basis for plaintiff's pain.

Plaintiff's fifth assignment of error asserts the ALJ erred by failing to include in his hypothetical question to the VE: (1) Dr. Phillips' opinion that plaintiff would likely be absent from work an average of four days per month; and (2) Dr. Umana's report that plaintiff would have problems completing tasks. As discussed above, the ALJ's decision rejecting Dr. Phillips' opinion in this regard is supported by substantial evidence. Therefore, the ALJ was not required to include this limitation in his hypothetical question to the VE. *See Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1235 (6th Cir. 1993). In addition, the ALJ reasonably incorporated Dr. Umana's limitation by limiting plaintiff to work involving only simple, repetitive, and routine tasks, short and simple instructions, and no more than ordinary and routine changes in work settings or duties. (Tr. 27). Accordingly, plaintiff's fifth assignment of error is without merit.

## III. This matter should be remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *Faucher,* 17 F.3d at 176. Therefore, this matter should be remanded for further

proceedings and the taking of additional evidence. A remand should include a determination of whether plaintiff's impairments or combination of impairments meets or equals Listing 1.02A, and further vocational considerations consistent with this decision.

## IT IS THEREFORE RECOMMENDED THAT

The decision of the Commissioner be **REVERSED AND REMANDED** for further proceedings consistent with this decision.

Date: 3/16/09

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JEANINE A. MOTLEY,
    Plaintiff

    vs                         Case No. 1:08-cv-418
                                    (Spiegel, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

28